Good morning, Your Honors. May it please the Court, Dick Herman for Mr. Swoger, who is here from Michigan to observe. Welcome. Hope the weather gets better for you. Farther than Defendants' actions, which were in evidence before the district court, quite simply don't pass the smell test. They made $4.5 million. Counsel, before you get to that, it seems to me that the heart of this case focuses on what act of Congress you are relying upon and whether that act, at least as I understand it, refers only to foreign minted coins. Which act of Congress does Mr. Swoger say authorized this coin, which he says is the first gold-minted coin in the United States? Well, Your Honor, that's not what Mr. Swoger says. Mr. Swoger says in the pretrial conference order of May of 2011, which superseded all of the pleadings which I drew, which may have been an artful, says... So the pleadings we should throw out because they're an artful? The pleadings, I mean, I know where you're going. So I'm just trying to say here you got a whole proceeding which goes for some time through discovery, through all it got to, and I realize there wasn't a lot here. So maybe that's not too big a deal. And what we've really got an argument here about is when we get to the pretrial conference, that claim is the only claim that the opposition should be able to defend, even though there's been all kinds of statements before that. Inartful, I'm using your term. It's always a pleasure, Your Honor, always a pleasure to appear in front of you. The pretrial conference order, which controls... Controls in what sense? It controls everything. There's no, you can't bring any issue to trial that's not in the pretrial conference order. And the pretrial conference order says, in order to conform to the act of February 9, 1793. It's, you know, it's docket 47. And that's volume two of the excerpts, page 99. And what happened in this case, and... Let me be sure you're talking about the same thing. This is the one at 2 Cong, Chapter 5, 1 Stat, 300, 1793. Is that correct? Yes. Okay. That act refers to, provided that foreign gold and silver coins shall pass current as money within the United States to be legal tender for the payment of all debts and demands. It says nothing about domestically minted coins, does it? No. You're exactly right. That's the red herring. That was the whole problem. And the defendants raised this from the first 12B-6 to the second motion for summary judgment, to the first motion for summary judgment, the second motion for summary judgment, and the third motion. The court denied it every other time, and I didn't think it was an issue the third time, because it's a red herring. It's not the issue. It's not the information which Mr. Swoger provided which had value to the defendants and made them $4 million. The information he provided was, if you look at the act, it changed the weight. It changed how many grains per dollar of Spanish gold. And there's, I mean, I don't know who's historically interested on the bench, but... Well, I think we may not be numismatists, but we are aware of the fact that within the numismatic community, these things make a great deal of difference. However, despite our lack of sophistication, it's fair to say that we are perfectly capable of analyzing what the record says that your client claimed was the secret or the information that you rely upon. And he couches it, as I understand it, in this act. So we look at what he said, we look at the act, and that's what we're wrestling with. Yeah, I... The act says 27.4 grains. That's the part of the act which made a difference. Is that what your client published back in, I think it was 1995? No, those publications... Direct your client. Sir, this is not a trial court. You have a lawyer here. We're interested in hearing him. Please don't gesticulate. Please don't talk. If you do, we're going to have to invite you to leave. Thank you. Go ahead. I'm sorry, Your Honor. No, the important information, the trade secret, the intellectual property, was that this coin would have to be heavier. That law made, required, a dollar's worth of Spanish gold to be heavier. And that meant that this coin was made in 1793 or 1794 before the United States made its first gold coins in 1795. Let's take that as the given here. So you're talking about the number of grams. But what the act appears to be dealing with is, at that point, admittedly, and I think your client would agree, there were no U.S. coins. So you had to have some coins. So they were saying, okay, we're going to accept foreign coins as described in the act. And they had to have certain weight, et cetera, et cetera. Right? Right. Isn't that what they said? Yes. And that was the whole point, to provide some specie currency that could be used until other things could be done. All well and good. But your client took this information. He published it. He talked to other people about it, as I understand it, according to the record. Where's the trade secret? Just assume for a moment that it is a secret. Where is the trade secret if it's widely known and published? So there are two different things. Mr. Swoger published the seminal work about these coins before. Afterwards, he discovered a number of things. I mean, this isn't the purse by the side of the road that somebody stumbled over. This is the purse by the side of the road that someone had very specialized knowledge who noticed that there was a purse where nobody else saw it because he had this knowledge. And a whole bunch of things happened. Could you ask Judge Smith, answer his question about what is different from what was published in the article? So what was different is originally people thought there was a heavier coin, heavier than this one, that had been made earlier along with the rest. There are less than 10 of these coins. This one is different from all the others. But one of the others… The initial of the… Right, and because of the weight. The important thing is the weight. And it was thought that there was another heavy coin. And it's in my supplemental excerpts, I show a picture of that coin and I say, no, you know, and defendants all through everything say, oh no, there's this heavier coin, there's this heavier coin. The coin isn't heavier. That was a mistake in an old catalog. And when Mr. Swoger realized that there was no heavier coin, then he wondered why is this coin heavier and he figured it out. So that was never published and that's the secret. These defendants owned that coin. Mr. Swoger said, you know, I know something… Excuse me, Mr. Counsel. Didn't your client state this, and it's called secret, in the article that he published? No. He did not? No. And you're saying that that information about the weight was first divulged and only divulged to the defendants in this case. Is that correct? Yes, what that weight meant, yes. What the weight meant? Meant, right. Okay. And from his perspective, that weight meant that it was the first coin minted in the United States pursuant to an act of Congress? That conformed to. That's a big difference because at least what I've read here, it was that this was the first official authorized coin. Not that it conformed to, but that it was first authorized. I don't understand, Your Honor. It says in the pretrial conference order that this coin was made, and I quote, in order to conform to the act, etc., of February 9th, 1793. Now, conformed to isn't authorized. And that's the red herring that the defendants have used from day one. And eventually the district court bought it. But that's not the information, and that's not the thing of value. The thing of value is that this was made at a different date, that this was made much later than anyone thought. And that's the information. The defendants then say, it's like, you know, it's like a contract where you have a satisfactions contract. We can never satisfy the defendants. No matter what we show, we can never satisfy the defendants. But we did show, what Mr. Swoger showed, was that this was a much later coin, and therefore, as the court very perceptively understands to numismatists, this is a big deal. You know, I mean, it's a big deal. This is the inverted zeppelin in a metal form. Exactly. So that's the crux of it. And the authorized and even the legal tender, which probably gets thrown in, those are just red herrings. But from your perspective, your case hangs on the word conform. Yes. Okay. Yes, exactly. May I reserve the rest of my time? Yes, of course. And I see you hanging there, Your Honor. I gather, though it's not explicit, that the Bank of New York was having these coins made, and these coins were circulating, and people used them before and after this act was passed, right? Yes. And so your theory is that once this act was passed, Mr. Brazier started making the coins that would conform to the 1793 act. Right. Even though it's stamped that says 1787, is there any reason why we need to be concerned about that? No. Mr. Brazier made coins a few years earlier that were dated 1742 and had on the side 1786 when they were really made. Someone discovered in recent years they had one where they could read it on the side, and there were only two of those that he made. These are very rare things, and a slight difference is a big deal. And you got that. Thank you, Your Honor. I don't hear from you, Judge. Well, you seemed a little bit annoyed with my first question. Then I apologize, Judge. Good morning, Your Honors. I'm Armin Vardian for the Apolese. Legal tender is not a red herring here. It's the only thing that would give this coin any additional value. As Your Honors pointed out, the existing base of knowledge in April 2009 when these parties met to discuss Mr. Swoger's information was that the prevailing theory, the most likely explanation for why Brazier made these coins was to put them at a weight that would make them an even legal tender amount in U.S. dollars. And that was published, not only the other theories, but the fact that this was the prevailing theory was published in the very auction catalog where my clients bought this coin, paid $2.9 million for it. It was in the auctioneering, put it in the catalog, and said the weight of the coin leads some people, by which they probably meant Mr. Swoger and others, to believe that these were made to conform to a $15 weight standard. So that already existed. Counsel said that in the complaint he unartfully pleaded that Mr. Swoger was offering a connection to the legal tender status. That's not just in the complaint. That's in every declaration that Mr. Swoger has given in this case, including the one to try and get reconsideration of the court's summary judgment order against him, which is at page 6 of the record. He still says that the coin was legal tender and that he was going to prove it. Now, if you permit, the difference between a coin being made in conformity with a statute and a coin being accepted as legal tender is huge. And I gave Judge Carney the example in oral argument about here in California, little bags of gold dust used to be accepted in exchange before there were coins, before there was a San Francisco mint, before there was coinage for the miners to buy their picks and shovels. Today, people still make bitcoin, if I can use a more contemporary example. And some people accept them, but they're not required to. So what would be a difference about this coin is not that Mr. Brazier is out there saying I know what the standards are and I'm going to make something in accordance with that standard. The question is whether Congress knew about him. And there is no evidence in the record, nothing at all, that would indicate that Congress knew about him. And that's the fundamental problem here. And correct me if I'm wrong, Counsel, but my understanding was that what really made this advice allegedly so valuable was that this coin was supposedly the first coin that was minted pursuant to the authority of the United States. Is that correct? That's right. Okay. Yes. And that would make it extremely valuable. It would. And it would also have made it legal tender at the time. I understand. Right. So the judge in the adjuster's case, you pointed out the various different kinds of summary judgment situations. This is the one where there's all kinds of arguments about certain facts, but none of them are material. None of them affect the outcome. The counsel mentioned that there were actually three summary judgment motions in this case. The third one was invited by Judge Carney because at the pretrial conference I was making motions in limine and one of them was to preclude testimony on the meaning of the statute because it was unambiguous what the statute meant. And the judge looked at me and said, isn't this a dispositive issue? Why don't you make a motion for a summary judgment? Let's focus on this now instead of taking the case to trial. I still thought that was the right decision then, and I think the Court should affirm it. Okay. If you have no other questions, I'll... No. Thank you. Okay. Rebuttals. Your Honors, if, as is actually the case, the important information was the date of manufacture of the coin, the date of manufacture, that is the time period, and what Mr. Swoger discovered and disclosed was that this coin was made after the act of 1793, after it became effective, then that the act that doesn't mention this coin is a red herring and makes no difference. It's not the information which Mr. Swoger was selling, basically. It's not the intellectual property that Mr. Swoger independently discovered and had not been published. Now, defendants published it. As soon as defendants... I mean, if you look at the sequence of events, Mr. Swoger discloses this information to the defendants. The defendants give him a $35,000 coin as a down payment, which is, by the way... That's your contention. They, of course, contend something quite to the contrary. Sure. Yeah. Is that not an issue of fact, Your Honor? Well, that is, if, in fact, it had anything to do with this coin. Yes. And if it doesn't, then it's a whole separate issue. Yes. Right.  No, I hear what you're saying. It's our version of the facts that the district court has to rule on. Not so... Let me just be sure, because this is ultimately what we're going to deal with. Yeah, I know. I just want to be sure. I'd asked you this before, and if I understand it, the sum and substance of your case is that the coin was made to, in quotes, conform to the act. That is the key. That's what you want us to focus on. And because of that, it was minted at a different date than the other coins, which is why, one, it's heavier, and two, the hallmark is in a different place. And that's the increase in value, and that's what makes it an extremely important coin. The weight and date are different, and there's nothing fishy about that, right? No. And those are facts that are in front of the judge. And then you get to, once this is disclosed, there's what appears to be, again, our facts. There's an agreement that Mr. Sorge is going to be paid. There's a $35,000 coin given as a down payment. Those are, if the district court has to rule on our facts, right, not on the red herring, but on our facts, not on whether Congress said Brazier can make coins for the Bank of New York, but whether now this coin is different for the reasons which Mr. Swoger has discovered, then how did the court on the evidence in front of it rule for the defense totally ignoring the $35,000? You're looking over your glasses, Your Honor. I think we have your point. Just trying to get your point. I think we have your point, and your rebuttal time is exhausted. But we thank both the counsel for your argument. This is, needless to say, a fascinating case, if not in law, in fact. And we thank you very much, and we hope you have a nice day. The court stands in recess.
judges: Lefkow, Smith, Smith